## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ANTHONY ALLEN AND** | : | **CIVIL ACTION** |
| **GENE SWINDELL,** | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **HOLIDAY UNIVERSAL, ET AL.,** | : | |
| **Defendants** | : | **NO. 05-5726** |

### AMENDED MEMORANDUM AND ORDER

PRATTER, J.                                                                     MARCH 17, 2008

Anthony Allen[1] and Gene Swindell, on behalf of themselves and all others similarly

situated, seek to pursue a class action attack upon the initiation fees charged by Holiday

Universal, Inc., Scandinavian Health Spa, Inc., and Bally Total Fitness Holding Corporation

(jointly, "Health Clubs").  The Complaint alleges that the Health Clubs violated Pennsylvania's

Health Club Act, 73 PA. CONS. STAT. ANN. §§ 2161, *et seq*. ("HCA"), which regulates health

clubs operating within the Commonwealth, and the Pennsylvania Unfair Trade Practices and

Consumer Protection Law, 73 PA. CONS. STAT. ANN. §§ 201-1, *et seq*. ("UTPCPL"), which

prohibits unfair or deceptive acts or practices in any trade or commercial endeavor.  Plaintiffs

also present claims for unjust enrichment (Count II) and for declaratory relief (Count III).

The Plaintiffs moved for class certification and the Health Clubs opposed the Motion.

For the reasons discussed more fully below, the Court will grant the Motion and the certify the

---

[1] Upon consideration of the Suggestion of Death of one of the original named plaintiffs, Estelle Robinson (Docket No. 47), and the unopposed Motion to Substitute Plaintiff (Docket No. 53), by Order of February 28, 2007, the Court granted the Motion and ordered the substitution of Anthony P. Allen in the place of Ms. Robinson.  Mr. Allen (the "Administrator") is Ms. Robinson's husband and the administrator of her estate.

class as specified in the accompanying Order.

**PROCEDURAL HISTORY**

Plaintiffs originally filed their claims in state court and the Health Clubs timely removed the case to federal court.  By Memorandum and Order of February 27, 2006, the Court denied the Plaintiffs' Motion for Remand.

The Health Clubs then moved pursuant to Rule 12(b) of the Federal Rules of Civil Procedure to dismiss the Complaint on the grounds that (1) the HCA is inapplicable, (2) Plaintiffs do not state a cognizable claim under the HCA, (3) the HCA is void because it is unconstitutionally vague, (4) Count I fails to state a claim for equitable relief because the UTPCPL does not authorize a private plaintiff to seek such relief, (5) inasmuch as there are valid contracts between Plaintiffs and a defendant, Count II fails to state a claim for unjust enrichment and/or restitution, and (6) Count III fails to state a claim for declaratory judgment because Plaintiffs have not rescinded their respective contracts.  By Memorandum and Order of September 11, 2006, the Court denied the Motion to Dismiss in its entirety.

The progress of this case has been delayed in part due to the unfortunate passing of Estelle Robinson, one of the original named plaintiffs, and later by the Notice of Chapter 11 Bankruptcy filed by the Health Clubs.  On October 15, 2007, upon receipt of confirmation by the parties that the automatic stay due to bankruptcy had been lifted, the Court vacated the stay and removed the case from suspense status.

The Plaintiffs' Motion for Class Certification, which was filed prior to the bankruptcy proceedings, is currently pending.

2

**FACTUAL BACKGROUND**

In February 2002, Ms. Robinson visited the Bally Total Fitness Club located at 3400 Aramingo Avenue, Philadelphia, Pennsylvania, and entered into a Retail Installment Contract prepared by the Health Clubs for a "Premier" family membersip for herself and her minor son. The terms of Ms. Robinson's contract allegedly required her to pay a "Membership Fee" of $632.00, of which Ms. Robinson paid $100.00 down and financed the balance at an annual percentage rate of 17.50%, with monthly payments of $19.10 for 36 months.  Ms. Robinson was further obligated to pay "Monthly Dues" of $2.60 for a total monthly payment of $21.70.  The membership renewed automatically.

In October 2002, Mr. Swindell visited the Bally Total Fitness Club located at 3000 Oxford Drive, Bethel Park, Pennsylvania and entered into a Retail Installment Contract prepared by the Health Clubs with Scandinavian for a fitness club membership.  Mr. Swindell allegedly was charged a membership fee of $1,275.00.  Mr. Swindell made a down payment of $100.00 and financed the balance of $1,175 at an annual percentage rate of 13%, with monthly payments of $39.75 for 36 months, including "Monthly Dues" of $3.00 per month.  Both Ms. Robinson and Mr. Swindell entered into the contracts for health club services for personal, family or household purposes.

The upshot of the Complaint is that the Health Clubs violated Section 2165 of the HCA by charging grossly excessive initiation fees.  Section 2165 provides, in relevant part, that

> the amount of any initiation fees imposed by a health club shall be reasonably related to the club's costs for establishing the initial membership[, and] shall not be imposed for the purpose of circumventing the requirements of this act.

73 PA. STAT. ANN. § 2165 (West 2007).

**LEGAL STANDARD**

The class action device is appropriate in cases where it "saves the resources of both the courts and the parties by permitting an issue potentially affecting every [class member] to be litigated in an economical fashion under Rule 23." General Tel. Co. of the Sw. v. Falcon, 457 U.S. 147, 155 (1982) (quoting Califano v. Yamasaki, 442 U.S. 682, 701 (1979)). A party seeking class certification bears the burden of proving that the proposed class action satisfies the requirements of Federal Rule of Civil Procedure 23. Johnston v. HBO Film Mgmt., Inc., 265 F.3d 178, 183-84 (3d Cir. 2001). To meet this burden, the Plaintiffs must satisfy the four prerequisites of Rule 23(a), and demonstrate that the action can be maintained under at least one of the subsections of Rule 23(b). Id. (citing Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 613-14 (1997)); Fed. R. Civ. P. 23.

Rule 23(a) requires that the movant demonstrate the following for certification:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). Rule 23(b) sets forth the circumstances under which an action may be maintained as a class action. Rule 23(b)(1) provides that class treatment is appropriate where

> the prosecution of separate actions by or against individual members of the class would create a risk of (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive

4

> of the interests of the other members not parties to the adjudications
> or substantially impair or impede their ability to protect their
> interests.

Fed. R. Civ. P. 23(b)(1).  Rule 23(b)(2) permits certification where "the party opposing the class

has acted or refused to act on grounds generally applicable to the class, thereby making

appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a

whole."  Fed. R. Civ. P. 23(b)(2).  Rule 23(b)(3) permits class actions where the court finds that

"the questions of law or fact common to the members of the class predominate over any

questions affecting only individual members, and that a class action is superior to other available

methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).

The Court of Appeals for the Third Circuit has recognized the utility, and sometimes

necessity, of looking beyond the pleadings at the class certification stage of the litigation.  See

Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 259 F.3d 154, 168-69 (3d Cir. 2001) ("In

reviewing a motion for class certification, a preliminary inquiry into the merits is sometimes

necessary to determine whether the alleged claims can be properly resolved as a class action.").

However, "it is not necessary for the plaintiffs to establish the merits of their case at the class

certification stage."  Chiang v. Veneman, 385 F.3d 256, 262 (3d Cir. 2004).  Moreover, "'the

interests of justice require that in a doubtful case . . . any error, if there is to be one, should be

committed in favor of allowing a class action."  Behrend v. Comcast Corp., 2007 WL 2972601,

at *1-2 (E.D. Pa. May 2, 2007) (citing Eisenberg v. Gagnon, 766 F.2d 770, 785 (3d Cir.1985)).

**DISCUSSION**

**I.      The Class Definition**

The Plaintiffs seek certification of a class of "all persons who, on or after December 7,

1998, entered into a contract for health club services with health clubs located in Pennsylvania and owned by The Health Clubs that required the payment of a membership fee in excess of $100.00" (the "Class").[2]  All officers and directors of the Health Clubs are excluded from the Class.  The Health Clubs assert that the Plaintiffs' Class definition is defective because it is overly broad and includes a "fail/safe" class.

### A.  Whether the Class Definition is Overly Broad

First, the Health Clubs assert that the Class definition is overly broad because it contains persons who have not been injured and who cannot maintain an action against the Health Clubs. The Health Clubs contend that, as currently defined, the Class includes health club members who not only accepted the benefits of their contracts, but wanted such benefits and thus would not be able to establish liability, as well as current members who do not wish to void their contracts.  In addition, the Health Clubs argue that because some part of the proposed Class likely would seek to continue to use their membership privileges under their contracts, the Plaintiffs effectively are seeking an advisory opinion with respect to those class members, which is prohibited by the "case or controversy" requirement of Article III, Section 2 of the federal Constitution.  Travelers Ins. Co. v. Obusek, 72 F.3d 1148, 1153 (3d Cir. 1995).

Courts have denied certification where the putative class "contains members lacking Article III standing," thus requiring any putative class to be "defined in such a way that anyone within it would have standing."  Denney v. Deutsche Bank AG, 443 F.3d 253, 264 (2d Cir. 2006)

---

[2] This definition of the Class is slightly modified from the definition set forth in the Complaint.  Modifying a class definition is contemplated by the Federal Rules of Civil Procedure, see Fed. R. Civ. P. 23(c)(1), and a court "is not bound by the class definition proposed in the complaint," Robidoux v. Celani, 987 F.2d 931, 937 (2d Cir. 1993).

(affirming the denial of a plaintiff class because the definition of the class was "so amorphous and diverse" that it was not "reasonably clear that the proposed class members have all suffered a constitutional or statutory violation warranting some relief") (citing Adashunas v. Negley, 626 F.2d 600, 604 (7th Cir. 1980)); Presbyterian Church of Sudan v. Talisman Energy, Inc., 244 F. Supp. 2d 289, 334 (S.D.N.Y. 2003) (noting that "each member of the class must have standing with respect to injuries suffered as a result of defendants' actions").

Courts likewise have held that a class definition is overly broad where the class encompassed persons who had not suffered any injury.  See also Owen v. Regence Bluecross Blueshield, 388 F. Supp. 2d 1318, 1334 (D. Utah 2005) ("[T]he proposed definition of the class is overbroad because many of the proposed class members have suffered no damages."); Zapka v. Coca-Cola Co., 2000 WL 1644539, at *3 (N.D. Ill. Oct. 27, 2000) (holding class definition improper where it included individuals who were not harmed); Canady v. Allstate Ins. Co., 1997 WL 33384270 (W.D. Mo. June 19, 1997) ("Because the court cannot accept plaintiffs' blanket contention that every member of the proposed broad class has allegedly suffered harm as a result of the defendants' wrongdoing, the court must find that the class definition is overbroad.").

Even where all class members have been injured, a class definition may be overly broad if the question of liability is specific to each class member.  For example, in Holmes v. Pension Plan of Bethlehem Steel Corp., 213 F.3d 124 (3d Cir. 2000), the Court of Appeals affirmed the district court's finding that the class definition was overly broad because the determination of actual liability with respect to any class member would require an individualized inquiry into the equities of each claim.  Id. at 137-38.  Here, the Health Clubs contend that the Class definition is overly broad because liability depends upon the application of the affirmative defense of

ratification, which, in turn, depends upon the circumstances and actions of each individual member.  Thus, according to the Health Clubs, the question of liability is specific to each class member because it is entirely dependent upon the extent to which each class member used the Health Clubs' services and accepted the benefits of the contract, thereby ratifying it and waiving the right to rescind.

The Health Clubs' arguments are not persuasive.  First, the Class definition does not include persons who have not suffered an injury.  If the initiation fees charged by the Health Clubs violate the HCA, then all persons who paid those fees have been injured, regardless of whether they personally view the fees as excessive or wish to void their contracts.[3]  Moreover, Count III of the Complaint, which relates to the HCA, does not seek to definitively void all contracts; rather, it seeks a declaration that "the contracts between Defendants and the Class members are voidable at the option of the respective Class members."  (Compl. ¶ 11.)  This remedy is derived directly from the HCA, which provides that "[a] health club contract which does not comply with this act shall be voidable at the option of the buyer."  73 PA. STAT. ANN. § 2167.  Thus, a determination of liability (i.e., that the Health Clubs' initiation fees are excessive) would entitle class members to the option of voiding their contracts, as well as money damages, or a determination that they do not owe the amount of any overcharge.  See 73 PA. STAT. ANN. § 201-9.2 (West 2008) (providing a "private action to recover actual damages").

Second, the Health Clubs' ratification argument does not preclude class certification because ratification is relevant to *damages*, not liability.  As an initial matter, however, the Court

---

[3] Indeed, in many class actions, class members do not know that they have been injured, or do not consider themselves to have suffered an injury, because they do not know that the defendant's action is illegal.

agrees with the Health Clubs that the HCA allows for ratification of a contract that does not

comply with the HCA.  The Health Clubs' interpretation of the HCA suggests that a health club

member, having discovered that he was overcharged with respect to the initiation fee, could, by

choosing to continue to make payments under the contract and accept the benefits, ratify the

contract and thereby waive the right to rescind it.  By expressly providing that noncompliant

contracts are *voidable*, instead of *void*, the HCA implicitly contemplates and provides for

ratification, given the conventional and familiar meanings of those terms.  See 73 PA. STAT.

ANN. § 2167.  It is indisputable that a *voidable* contract may be ratified, while a *void* contract

may not.  See, e.g., Yannuzzi v. Commonwealth, 390 A.2d 331, 332 (Pa. Commw. 1978) ("It is

true that there is an important technical distinction between 'void' and 'voidable': The term

'void' is properly applied to those contracts that are of no effect whatsoever, whereas a

'voidable' contract can be cured by the act or confirmation of one of the parties.").[4]

> However, the HCA also explicitly provides that any attempted waiver of its provisions is

"void and unenforceable."  73 PA. STAT. ANN. § 2170.  Thus, because ratification is a species of

waiver, and because ratification of a noncompliant contract effectively waives the HCA

provision at issue, Section 2170 appears to be at odds with Section 2167.  The waiver of the right

to rescind becomes synonymous with waiver of the excessive initiation fee, an outcome that

---

[4] See also Wamsley v. Champlin Refining & Chemicals, Inc., 11 F.3d 534, 538-39 (5th Cir. 1993) (citing Restatement (Second) of Contracts §§ 7 cmt. a, 8 and 85 cmt. a) ("To say that a contract is voidable is to say that an antecedent promise created a legal duty on the promisor's part and that the promisor has the power either to avoid performance, based on any one of the several grounds of avoidance, or to ratify the promise by making a new one. . . . Promises that are void cannot be ratified.  The reason for this is simple: Void promises are not legally binding and thus, are not contracts.  Without an antecedent contract to ratify, there can be no ratification.  To say that a promise is void is to say that it created no legal obligation and that the promisor is without the power to bind himself under a new promise to perform the antecedent promise.")

appears to be expressly prohibited by Section 2170.

The Plaintiffs urge the Court to interpret Section 2170 as modifying the standard meaning of "voidable."  As the Plaintiffs would have it, contrary to the general rule that voidable contracts may be ratified, the statutory right to void a contract that does not comply with the HCA cannot be waived by ratification or any other means.  This interpretation would leave the "buyer" of a health club contract free to void the contract at any time in perpetuity, regardless of whether he or she has accepted the benefits of the contract or for how long.

Beyond the troublesome implications of this result,[5] there is no evidence that Pennsylvania's General Assembly was unaware of the standard definition of "voidable," or that the General Assembly intended any meaning of the term "voidable" other than the standard meaning.  If the General Assembly intended to preclude ratification of a noncompliant contract, it could have used the term "void" in Section 2167 rather than the term "voidable."  Cf. Cal. Civ. Code § 1812.91 ("Any contract for health studio services which does not comply with the applicable provisions of this title shall be void and unenforceable as contrary to public policy.").  By providing the buyer the option of rescission, the General Assembly implicitly also provided the buyer the option of ratification – i.e., waiver of the right to rescind.  While potentially contradictory, Section 2170 does not change this straightforward interpretation of the

---

[5] The Plaintiffs' proposed interpretation is problematic because the hypothetical inapplicability of ratification creates a situation where the parties to the contract are left with a contract that is permanently voidable, but that can never be ratified.  A "voidable" contract, if neither voided nor ratified, occupies a sort of contract purgatory; the corresponding incertitude is undesirable for all parties to the contract.

10

unambiguous language in Section 2167.[6]  See Long v. Sears Roebuck & Co., 105 F.3d 1529,

1536 (3d Cir. 1997) ("When the plain text of a statute is clear then "courts must presume that a

legislature says in a statute what it means and means in a statute what it says.") (citing

Connecticut Nat. Bank. v. Germain, 503 U.S. 249, 253-54 (1992)).

The two potentially contradictory sections are easily reconciled by reference to the

specific language used in Section 2170.  See 1 PA. CONS. STAT. ANN. § 1933 ("Whenever a

general provision in a statute shall be in conflict with a special provision in the same or another

statute, the two shall be construed, if possible, so that effect may be given to both.").  Section

2170 provides that any "attempted waiver by the buyer of the provisions of this act shall be

deemed contrary to public policy and shall be void and unenforceable."  73 PA. CONS. STAT.

ANN. § 2170.  Ratification of, or waiver of the right to rescind, a noncompliant contract

technically is not a waiver of any provision in the HCA.  Thus, while ratification might

effectively *result* in the waiver of a provision of the HCA, it falls outside the literal confines of

Section 2170's plain language.  Taken together, the two provisions provide that consumers have

(1) the option to void or ratify noncompliant contracts, and (2) the inability to expressly waive

---

[6] The Pennsylvania statute on statutory construction provides:

> (a) The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly.  Every statute shall be construed, if possible, to given effect to all its provisions.
> (b) *When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit.*

1 PA. CONS. STAT. ANN. § 1921 (emphasis added).

any of the provisions of the HCA.  Read thusly, these two propositions are not incompatible.

Approaching the issue from another angle, the Plaintiffs also assert that where the circumstance giving rise to a contract's voidability is the violation of a remedial statute, the doctrine of ratification does not apply.  However, with few exceptions, federal courts have applied this construct only to *federal* remedial statutes.  See, e.g., Hogue v. Southern R. Co., 390 U.S. 516, 517 (1968) (rejecting applicability of tender back defense to Federal Employees Liability Act because the requirement of a "refund" would be "wholly incongruous with the general policy of the Act to give railroad employees a right to recover"); Jakimas v. Hoffman-La Roche, Inc., 485 F.3d 770, 782-83 (3d Cir. 2007) (rejecting the applicability of the defenses of ratification and tender back to claims brought under ERISA to avoid deterring suits and undermining the general policy of the remedial statute in question); Long, 105 F.3d at 1540-41 (rejecting applicability of tender back defense to ADEA claims because that approach "would best serve the purpose of the ADEA," which "was clearly a federal remedial statute").  Research has revealed no instance where a court has applied this rule to a Pennsylvania consumer protection statute, and the Court declines to extend the rule to apply under the specific circumstances presented here, where the state statute in question expressly uses the term "voidable" instead of "void."

Thus, the Court concludes that the health club contracts at issue here, if determined to be voidable pursuant to Section 2167, potentially could be ratified.  However, this conclusion does not preclude class certification.  Indeed, under the specific factual circumstances presented here, the ratification defense is irrelevant to liability.  Rather, the ratification defense is only relevant if liability is proved, and then only with respect to damages.

12

Even then, contrary to the Health Clubs' assertions, the question is not whether class members *have already* ratified their contracts, but rather whether class members *will* ratify their contracts. The common law doctrine of ratification results in "the enforcement of a promise to perform all or part of an antecedent contract of the promisor, previously voidable by him, but not avoided prior to the making of the promise." Long, 105 F.3d at 1536 n.10 (citing Restatement (Second) of Contracts § 85 (1981)). Ratification operates to allow a party having the power to rescind his contractual duty to make, or be deemed to have made, a new promise to perform his previously voidable duty and thereby extinguish his power of avoidance. Restatement (Second) of Contracts § 85 cmt. a.

Ratification, however, "cannot occur until the impediment to the conclusion of the agreement is eliminated." Williston on Contracts § 19:56. See also Sixsmith v. Martsolf, 196 A.2d 662, 663 (Pa. 1964) ("A contract secured by fraud is voidable only at the option of the injured party, who must act promptly *on the discovery of the fraud* or the right to rescind is waived.") (citations omitted) (emphasis added). A party is estopped from rescinding an agreement where the party has become aware that an agreement is potentially unlawful, but does not rescind the agreement at that time and instead continues with the relationship established by the agreement. In re Estate of Long, 615 A.2d 421, 422 (Pa. Super. 1992). In other words, the party charged with ratification must have acted voluntarily, intentionally and *with full knowledge of all material facts*; ratification may not be based upon mere negligence. Schwartz v. Mahoning Valley Country Club, 114 A.2d 78, 80 (Pa. 1955); Fed. Pac. Elec. Co. v. First Pennsylvania Bank, 405 A.2d 530, 478-79 (Pa. Super. 1979).

Under the circumstances presented here, no legally cognizable ratification can have

13

occurred because at this time the health club members remain unaware of any facts rendering

their contracts voidable.  Indeed, at this time it has yet to be determined whether the health club

contracts are voidable at all, that is, whether the contracts fail to comply with the HCA.  Only if

liability is proved, will the class members *then* have the option to rescind – and thus the corollary

opportunity to ratify[7] – their contracts.  Prior to any such determination on liability, the class

members do not have "full knowledge of all material facts," as required to ratify a contract.  See

In re Allegheny Intern, Inc., 954 F.2d 167, 179 (3d Cir. 1992) (explaining that contract based on

misrepresentation is voidable so long as the party with voiding power remained unaware of the

true facts); Retail Brand Alliance, Inc. v. Rockvale Outlet Center, 2007 WL 403885, at *6 (E.D.

Pa. Jan. 31, 2007) ("The defrauded party can ratify the contract if 'it accepts the benefits flowing

from it, or remains silent, or acquiesces in the contract for any considerable length of time *after*

*the party has the opportunity to annul or avoid the contract*.'") (citation omitted) (emphasis

added).[8]  Thus, the potential applicability of the ratification defense does not preclude class

---

[7] Ratification may be found under a variety of circumstances, such as intentionally accepting benefits under the contract after discovery of facts that would warrant rescission, remaining silent or acquiescing in the contract for a period of time after having the opportunity to avoid it, or recognizing the validity of the contract by acting upon it, performing under it, or affirmatively acknowledging it.  Sams v. Sams, 808 A.2d 206, 212 (Pa. Super. 2002) (citing Nat'l Auto Brokers Corp. v. Aleeda Dev. Corp., 364 A.2d 470, 476 (Pa. Super. 1976)); Seal v. Riverside Fed. Sav. Bank, 825 F. Supp. 686, 696 (E.D. Pa. 1993) (citing Nat'l Auto Brokers Corp., 364 A.2d at 476).

[8] Moreover, according to the Restatement (Second) of Contracts, if the same grounds for avoidance exist when the contract is ratified, the party again enjoys the power to avoid performance under the ratified contract.  Id. § 85 cmt. b.  This suggests that continuing non-compliance with the HCA following ratification would renew the power to avoid performance and again give health club members who may have previously ratified their noncompliant contracts the option to rescind.  Where, however, such grounds no longer exist, ratification mandates performance of the ratified contract.

certification.  This analysis and its conclusion apply with equal force to the defenses of waiver

and, as discussed more fully below, voluntary payment.

In contrast, the Health Clubs' remaining defenses, namely, laches and estoppel, are

potentially relevant to liability.  These defenses, however, also fail to preclude class certification

because they are generally applicable to the Class as a whole and do not depend upon any

individualized factual determinations.  In this Memorandum, the Court will focus primarily on

the doctrines of ratification and voluntary payment, as that is where the parties have focused their

own efforts in the context of the certification dispute.

### B.        Whether the Class Definition Includes a "Fail/Safe" Class

The Health Clubs also assert that the Class definition creates an improper "fail/safe"

class, that is, membership in a portion of the Class depends upon a finding for Plaintiffs' on the

merits.  See, e.g., Dafforn v. Rousseau Assoc., Inc., 1976 WL 1358, at *1 (S.D. Ind. Jul. 27,

1976) (class definition of those homeowners charged illegal fees created impermissible

"fail/safe" class because a jury finding that fees were not illegal would at the same time

determine that there was no class).  Here, according to the Health Clubs, the Plaintiffs' "fail/safe"

class involves Bally Holding.  The Plaintiffs' Class definition depends upon which health clubs

are "owned by Defendants," but Bally Holding's ownership of Physical Fitness Centers of

Philadelphia ("PFCP"), which is not a named defendant, is disputed.

The Plaintiffs respond that the "fail/safe" class prohibition seeks to preclude classes

where "defining the purported class . . . requires addressing the central issue of liability to be

decided in the case."  Forman v. Data Transfer, Inc., 164 F.R.D. 400, 403 (E.D. Pa. 1995).  Here,

15

argue the Plaintiffs, because the question of which Pennsylvania health clubs are owned by the

Defendants is not the "central issue of liability to be decided," there is no "fail/safe" class.  Thus,

the rule against one-way intervention – where a class is bound only by a favorable judgment – is

not violated.  The Plaintiffs maintain that they do not intend to challenge the Defendants'

representations regarding ownership of PFCP.[9]

The Court concludes that under these circumstances, the question of whether any

particular health club in Pennsylvania is owned by the Health Clubs is a question of fact not

central to the question of liability and easily answered through further discovery.  The Court

expects the parties to promptly clarify any remaining confusion as to this issue.

## II.     Rule 23(a)

### A.     Numerosity

Numerosity requires a finding that the putative class is "so numerous that joinder of all

members is impracticable."  Newton, 259 F.3d at 182; Fed. R. Civ. P. 23(a)(1).  "No single

magic number exists satisfying the numerosity requirement."  Behrend v. Comcast Corp., 245

F.R.D. 195, 202 (E.D. Pa. 2007) (citation omitted).  However, our Court of Appeals typically has

approved classes numbering 40 or more.  See Stewart v. Abraham, 275 F.3d 220, 226-27 (3d Cir.

2001).

Here, the Plaintiffs assert that the number of individuals in the proposed Class

corresponds to the number of health club contracts executed during the Class Period, which

---

[9] At oral argument, Plaintiffs' counsel stated that the Plaintiffs have "no view" as to
which clubs in Pennsylvania are owned by Bally Total Fitness Holding Company.  (Tr. 1/9/08 at
10-11.)

extends from December 1998 to the present.  Relying on the Health Clubs' responses to interrogatories, the Plaintiffs estimate that approximately 142,118 contracts for health club services were executed between 1999 and 2004, in addition to any contracts executed from 2004 to the present.

While the Health Clubs do not dispute the number of contracts cited by the Plaintiffs, they assert that the Plaintiffs have failed to offer any facts as to how many persons were allegedly injured or how many persons could still void their contracts.  See Sandlin v. Shapiro & Fishman, 168 F.R.D. 662, 666 (M.D. Fla. 1996) (holding that numerosity not shown where, despite large number of possible class members, plaintiff failed to allege specific facts as to the number of class members who suffered actual injury so as to have standing to sue).  In addition, although the remedy provided by the HCA is the buyer's option to rescind the contract, 73 PA. CONS. STAT. ANN. § 2167, the Health Clubs emphasize that the Plaintiffs have not proffered any facts as to which persons, if any, other than the named plaintiffs, wish to exercise this option.

These arguments parallel the Health Clubs' arguments concerning the Class definition. For the reasons previously discussed, the Court concludes that the Class definition encompasses only persons who, if liability is proven, have suffered a harm.  That is, every person who executed a contract requiring payment of initiation fees in excess of $100 is properly a member of the Class.  Here, the Health Clubs do not dispute that the approximately 140,000 persons who executed contracts between 1999 and 2004 paid initiation or "Membership" fees.  Thus, the Court concludes that the proposed Class is sufficiently numerous to make joinder impracticable and the numerosity requirement is satisfied.

    B.        Commonality

        To satisfy the commonality requirement, plaintiffs must show the existence of at least one question of law or fact common to the class.  Fed. R. Civ. P. 23(a)(2); Johnston, 265 F.3d at 184. The commonality threshold is low, Powers v. Lycoming Engines, 245 F.R.D. 226, 236 (E.D. Pa. 2007), and does not require "an identity of claims or facts among class members," Behrend, 245 F.R.D. at 202.  The commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class.  Johnston, 265 F.3d at 184.

        The existence of individual facts and circumstances will not defeat commonality so long as the plaintiffs allege harm under the same legal theory.  Baby Neal, 43 F.3d at 56-58. Nevertheless, "[c]ommonality will not be found where the alleged common issues can only be resolved by making factual determinations that will be different for each class member." Holmes, 1999 WL 554591, at *6 (citing Reilly v. Gould, Inc., 965 F. Supp. 588, 598 (M.D. Pa. 1997)).  Courts have held that the commonality requirement cannot be met "where Plaintiffs' proposed common questions are inherently individualized, requiring inquiry into the particular circumstances of each [Plaintiff] . . . ."  Forman, 164 F.R.D. at 403.  In other words, "[t]he common issue must significantly advance the litigation."  Kane v. United Independent Union Welfare Fund, 1998 WL 78985, at *4 (E.D. Pa. Feb. 24, 1998).

        Here, the Plaintiffs assert that the principal question common to all putative class members is "whether Defendants violated the HCA, and thus the [UTP]CPL, by imposing initiation fees not reasonably related to the costs for establishing an initial health club

18

membership." (Pl. Mot. 10.)  The Plaintiffs allege that "each member of the proposed Class is a victim of the Health Clubs' noncompliance and was victimized by the same or substantially similar unfair and deceptive conduct." (Id.)

The Health Clubs' argument against the existence of commonality is two-fold.  They contend that the proposed common question of liability is "inherently individualized" and requires an inquiry into the particular circumstances of each class member because of (1) the application of the doctrine of ratification, and (2) the many different types of memberships with disparate fees and benefits.

First, the Health Clubs contend that the common question asserted by the Plaintiffs will not "significantly advance" the litigation because the answer to the question of whether the Health Clubs violated the HCA determines only whether a member *theoretically* has or had the option to rescind the contract.  According to the Health Clubs, the answer to the Plaintiffs' proffered common question does not address the question of whether any member *actually currently* has the option to void the contract because each member's current options depend upon his or her individual circumstances.  The Health Clubs contend, for example, that members who ratified their contracts can no longer rescind them.  In order to determine liability, argue the Health Clubs, the Court must determine exactly what benefits each member accepted under his or her contract, as well as the length of time the member acquiesced in the contract or remained silent.  Thus, according to the Health Clubs, the alleged common issues can only be resolved by individualized factual determinations for each class member, and this inherently individualized inquiry precludes a finding of commonality.

As previously discussed, the doctrine of ratification becomes relevant only at the damages stage of this case; it is irrelevant to the question of whether the Health Clubs violated the HCA. In other words, the question of whether the initiation fees exceeded the reasonable cost of establishing a membership is entirely separate and distinct from the question of whether any given class member can be deemed to have ratified his or her contract.  The issue of ratification, if applicable, is relevant in the event liability is proven to determine whether a particular class member may rescind his or her contract and/or recover any damages.  Thus, the potential applicability of the doctrine of ratification does not preclude a finding of commonality.

Second, the Health Clubs assert that the numerous different types of memberships offered by Holiday and Scandinavian, each with differing membership fees, terms and benefits, raise individualized factual issues that defeat commonality.  According to Julie Adams, the Senior Vice President of Membership Services for Bally, Holiday and Scandinavian, the "Membership Fee" charged under any given contract varies according to the type of membership purchased. (Adams Affidavit ¶ 15, Def. Response Ex. A.)  Thus, argue the Health Clubs, the "Membership Fee" in any given case cannot always be equated with an "initiation fee," and an individualized inquiry is required in every case to determine what was included.

For example, both Scandinavian and Holiday offer non-renewable contracts with a fixed term.  The "Membership Fee" under these contracts covers the entire membership term. Consequently, the "Membership Fee" for this type of membership program might exceed the alleged reasonable limit because it covers much more than simply the costs of the paperwork to complete the contract.  Similarly, the "Membership Fee" charged for renewable contracts also cannot be considered simply an "initiation fee" because it purportedly covers the first month of

the contract and other goods, services and privileges agreed to by the parties, as well as the right to renew the membership indefinitely.  The Plaintiffs' Class definition would include health club members with both renewable and non-renewable memberships, in addition to other specific membership programs.

According to the Health Clubs, the various specific membership programs likewise raise individual factual questions as to the definition and composition of the "Membership" and/or "initiation" fees.  For example, both Holiday and Scandinavian at one time offered a "Rapid Results System" membership.  The "Membership Fee" for this type of membership included a package of weight loss goods, an initial evaluation consultation session, three personal training sessions, a final evaluation consultation, nationwide use of Bally clubs, free racquetball and child care services, and free exercise classes, as well as the first month's membership and the right to renew the membership indefinitely.  (Adams Aff. ¶ 17.)  Thus, argue the Health Clubs, the "Membership Fee" for this type of membership covered far more than the paperwork involved in establishing a new membership and necessarily exceeded the alleged reasonable limit.

Finally, the Health Clubs also point to the "family" memberships offered by Scandinavian and Holiday in conjunction with each different type of membership program.  (Adams Aff. ¶ 18.)  Under these "family" memberships, multiple family members can join under the same contract.  The Health Clubs argue that the cost of the paperwork for such memberships exceeds the cost for a single individual and, therefore, buyers of these memberships should not be included in the Class.  The Health Clubs assert that if buyers of such "Rapids Rewards System" and family memberships were included in the Class, the Court would have to determine the value of the goods and services that such members received, the number of persons included under the single

"Membership Fee," and the time period for which the member(s) had access to membership privileges.

Notwithstanding the likely complexity of determining liability with respect to different membership classes, the central issue in this case remains the same regardless of the specific type of membership, namely, whether the "Membership Fee" for any given membership program exceeded the reasonable cost of establishing the initial membership, and thus violated the HCA. The existence of different types of memberships simply means that, with respect to each type of membership, there will be a need to determine what portion of the "Membership Fee" was specifically allocated for the costs of "establishing" a health club membership – i.e., what portion constitutes an "initiation fee" charged in exchange for nothing other than the establishment of a membership.  The discrete costs of additional goods and services for which a member would have to pay extra anyway can be easily discounted because the Health Clubs price each element of their membership fees separately.  (See "Bally Total Fitness Corporation: National Pricing Summary," Pl. Reply Ex. B.)

Moreover, even if the Health Clubs blended legitimate initiation fees with charges for other health club goods and services such that the charges could not be separated, the entire "Membership Fee" would have to be considered an initiation fee subject to the limits of the HCA.  As the Plaintiffs correctly contend, any other result would allow the Health Clubs to escape the constraints of the consumer protection statute by charging consumers *even more* than they otherwise would have.

C.      **Typicality**

To evaluate typicality, the Court must inquire "whether the named plaintiffs' claims are typical, in common-sense terms, of the class, thus suggesting that the incentives of the plaintiffs are aligned with those of the class." Beck v. Maximus, Inc., 457 F.3d 291, 295-296 (3d Cir. 2006) (quoting Baby Neal, 43 F.3d at 55). "Typicality requires a strong similarity of legal theories to ensure that the class representatives' pursuit of their own goals will work to benefit the entire class." Powers, 245 F.R.D. at 236 (citing Barnes v. Am. Tobacco Co., 161 F.3d 127, 141 (3d Cir. 1998)); Jones v. GPU, Inc., 234 F.R.D. 82, 97 (E.D. Pa. 2005)). The typicality requirement entails an inquiry as to whether "the named plaintiff's individual circumstances are markedly different or . . . the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based." Behrend, 245 F.R.D. at 203 (quoting Hassine v. Jeffes, 846 F.2d 169, 177 (3d Cir. 1988)).

"'[F]actual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory.'" Beck, 457 F.3d at 295-296 (quoting Baby Neal, 43 F.3d at 58).[10] However, "[w]here the defendant can raise unique defenses to each plaintiff's claim,

_____

[10] According to the Supreme Court, the typicality and adequacy inquiries often "tend[ ] to merge" because both look to potential conflicts and to "whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." Beck, 457 F.3d at 296 (quoting Amchem Products, Inc. v. Windsor, 521 U.S. 591, 626 n.20 (1997)). Because of the similarity of these two inquiries, certain questions – such as whether a unique defense should defeat class certification – are relevant under both. Nevertheless, our Court of Appeals has emphasized that a court should address each Rule 23(a) factor in a certification decision. "Despite areas of overlap, each factor involves distinct considerations. The adequacy inquiry, for example, factors in competency and conflicts of class counsel, which the typicality requirement does not." Beck, 457 F.3d at 296 n.2

typicality may not exist if the defenses could threaten to become the focus of the litigation."

Powers, 245 F.R.D. at 236 (quoting Jones, 234 F.R.D. at 98).  A court may sever claims or use

subclasses to treat individual issues separately.  Eisenberg v. Gagnon, 766 F.2d 770, 786 (3d Cir.

1985).

 Here, the Plaintiffs contend that they have alleged "a common pattern of wrongdoing, and

will present the same evidence (based on the same legal theories) to support both their own

claims and the claims of the Class members."  (Pl. Mem. 11.)  The Health Clubs respond that the

Plaintiffs cannot demonstrate typicality because (1) there are factual circumstances unique to the

named plaintiffs; (2) the HCA as applied with respect to the named plaintiffs violates the

dormant commerce clause; (3) the named plaintiffs' claims are precluded by the "voluntary

payment" doctrine; and (4) the named plaintiffs are *former* members whose claims are not typical

of those of *current* members.  The Court will address these arguments *seriatim*.

 First, the Health Clubs contend that, through their prior conduct, Ms. Robinson and Mr.

Swindell ratified their contracts and, therefore, their claims are not typical of the claims of other

class members.  According to the Health Clubs, both Ms. Robinson and Mr. Swindell enjoyed

their health club privileges for years, belying any allegation of actual harm.  Specifically, Ms.

Robinson's son used his privileges under the contract for over three years, and continued to use

his privileges even after the Membership Fee was paid off.  Mr. Swindell used his privileges for

21 months.  Moreover, both Ms. Robinson and Mr. Swindell purchased a second contract with

full knowledge of the benefits and privileges they would receive in exchange for the Membership

---

(citation omitted).

Fee.  The continued use of membership privileges, argue the Health Clubs, demonstrates that the named plaintiffs accepted the benefits of their contracts and ratified them.

For the reasons previously discussed at length, the "ratification" argument does not render the named plaintiffs' claims atypical because it is irrelevant to the determination of liability.[11] Thus, any ratification defense the Health Clubs may assert against the named plaintiffs does not preclude a finding of typicality.

Second, the Health Clubs assert that application of the HCA with respect to the named plaintiffs implicates the dormant commerce clause.  Because under their contracts both Ms. Robinson and Mr. Swindell received nationwide privileges for the use of out-of-state clubs, the Health Clubs contend that regulation of their contract fees unlawfully permits the Pennsylvania General Assembly to dictate what the Health Clubs can charge for the use of health clubs in states other than Pennsylvania.  See Healy v. Beer Institute, Inc., 491 U.S. 324 (1989) (A state may not adopt legislation that has the practical effect of establishing a scale of prices for use in other states.)

The Court concludes that the dormant commerce clause is not implicated here.  Class members are limited to those persons who purchased health club memberships *in Pennsylvania*. Thus, as far as this case is concerned, the Health Clubs are not alleged to have sold services in states other than Pennsylvania.  Even though a membership package may include the right to use out-of-state clubs, that service is still being sold in Pennsylvania by health clubs located in

---

[11] Moreover, the Court fails to see how the named plaintiffs' factual circumstances are *a*typical, as many health club users likely continued to avail of themselves of the health club facilities, and thus accepted the benefits of their contracts.

Pennsylvania.  The dormant commerce clause does not apply under these circumstances.  See

Cloverland-Green Spring Dairies, Inc. v. Pennsylvania Milk Marketing Bd., 298 F.3d 201-211

(3d Cir. 2002) ("[I]f the state regulation does not discriminate against interstate commerce, but

'regulates even-handedly' and merely 'incidentally' burdens it, the regulation will be upheld

unless the burden is 'clearly excessive in relation to the putative local benefits.") (citation

omitted).

Third, taking an approach similar to their "ratification" argument, the Health Clubs

contend that any voluntary payments made under the contract preclude recovery of those

payments.  Because Ms. Robinson and Mr. Swindell made voluntary payments under their

respective contracts, the Health Clubs assert that their claims are precluded pursuant to the

"voluntary payment" doctrine.  The "voluntary payment doctrine" provides that money paid

under a claim of right by one who has knowledge of the relevant facts cannot be recovered on the

ground that the claim was illegal unless the payment was made under compulsion.  Wilson v.

School District of Phila, 195 A. 90, 100 (Pa. 1937); Acme Markets, Inc. v. Valley View

Shopping Center, Inc., 493 A.2d 736, 737 (Pa. Super. 1985).[12]  Even though other class members

---

[12] As stated by the Supreme Court,

> Where a party pays an illegal demand with a full knowledge of all the
> facts which render such demand illegal, without an immediate and
> urgent necessity therefore, or unless to release his person or property
> from detention, or to prevent an immediate seizure of his person or
> property, such payment must be deemed voluntary and cannot be
> recovered back.  And the fact that the party at the time of making the
> payment files a written protest does not make the payment
> involuntary.

Union Pac. RR Co. v. Dodge County Comm'r, 98 U.S. 541, 543 (1878).

also may be subject to the voluntary payment doctrine, the Health Clubs contend these factual particulars and defenses render the named plaintiffs' claims atypical.

Even if applicable,[13] the voluntary payment doctrine does not destroy typicality because the class representatives are hardly "unique" in having made "voluntary" payments on their contracts. Indeed, it is likely that most, if not all, health club members will have made voluntary payments, and thus the positions of Ms. Robinson and Mr. Swindell are typical of the Class as a whole. Moreover, as previously discussed, the voluntary payment doctrine is potentially applicable only to the issue of damages, not liability. The fact that the named plaintiffs and/or class members made and continue to make voluntary payments under their contracts says nothing about whether the amount charged is unlawful.

Lastly, the Health Clubs assert that the named plaintiffs are *former* members whose claims are not typical of the claims of *current* members, who may wish to continue to use their membership privileges. Indeed, Mr. Allen, the administrator of Ms. Robinson's estate, never had a contract.

This asserted factual difference is immaterial to the central question of whether the initiation fees charged by the Health Clubs violate the HCA. Even if some putative class members wish to continue using their membership privleges, they nonetheless have an interest in recovering an unlawful initiation fee and/or having the *option* to rescind their contract. At a fundamental level, the claims of the named plaintiffs and putative class members are based on the same alleged course of misconduct (the charging of unreasonable initiation fees) and the

---

[13] There do not appear to be any cases applying the voluntary payment doctrine to transactions allegedly in violation of a Pennsylvania consumer protection statute.

same legal theories, notwithstanding any individual factual differences.  This fundamental underlying similarity is sufficient to ensure that the named plaintiffs will advance the interests of the Class.

In sum, the Court concludes that the potential factual differences between the named plaintiffs and other class members do not defeat typicality, and that requirement is met here.

### D.    Adequacy of Representation

Class representatives must "fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  The adequacy inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent."  Beck, 457 F.3d at 296 (quoting Amchem, 521 U.S. at 625).  It "assures that the named plaintiffs' claims are not antagonistic to the class and that the attorneys for the class representatives are experienced and qualified to prosecute the claims on behalf of the entire class."  Id. (quoting Baby Neal, 43 F.3d at 55).  Thus, the Court must determine "whether the representatives' interests conflict with those of the class and whether the class attorney is capable of representing the class."  Johnston, 265 F.3d at 185.  "Adequacy of representation depends on the circumstances surrounding each case."  Behrend, 245 F.R.D. at 204 (citing Wetzel v. Liberty Mutual Ins. Co., 508 F.2d 239, 247 (3d Cir. 1977)).  The burden is on the defendant to prove that the representative plaintiffs will not adequately represent the class. Lewis v. Curtis, 671 F.2d 779, 788-89 (3d Cir. 1982).

### 1.    Adequacy of the Named Plaintiffs as Class Representatives

The Health Clubs assert that the adequacy requirement is not met in the present case because (a) there is a conflict between current and former health club members; (b) there is a

conflict between one-month members and those whose memberships are longer; (c) there is a conflict between default members and non-default members; (d) Mr. Swindell is not an adequate representative; and (e) the Administrator is not an adequate representative.

### a.    Conflict Between Current and Former Members

The Health Clubs contend that there is a conflict between current and former health club members because these two groups have disparate goals and incentives in the litigation. Specifically, the Health Clubs posit that former members have only one goal, the recovery of money, while current members, on the other hand, potentially have an interest in maintaining their memberships.  Current members, who might have the opportunity to continue to use their memberships for life, may be opposed to the imposition of treble or punitive damages that may undercut or jeopardize the Health Clubs' ability to maintain the level and quality of services current members are now receiving.

Intraclass conflicts "may negate adequacy under Rule 23(a)(4)."  Langbecker v. Elec. Data Sys. Corp., 476 F.3d 279, 315 n.28 (5th Cir. 2007) (holding that trial court erred in certifying class without evaluating intraclass conflicts).  See also Valley Drug Co. v. Geneva Pharmaceuticals, Inc., 350 F.3d 1181, 1189-92 (11th Cir. 2007) (finding class representatives inadequate where their economic interests and objectives conflicted substantially with those of absent class members); Pickett v. Iowa Beef Processors, 209 F.d 1276, 1280 (11th Cir. 2000) (representation inadequate where class includes those "who claim harm from the very acts from which other class members benefitted"); Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331 (4th Cir. 1998) (holding that current franchisees who had an interest in the

continued viability of the franchisor had an inherent conflict with former franchisees whose only interest was in the maximization of damages); Slader v. Pearle Vision, Inc., 2000 WL 1702026, at *1 (S.D.N.Y. Nov. 14, 2000) (holding that an employment discrimination class consisting of current and former employees could not be certified because a former employee's primary interest necessarily centered on recovering back pay, while a current employee might well be far more interested in obtaining injunctive relief); Alston v. Virginia High Sch. League, Inc., 184 F.R.D. 574, 579 (W.D. Va. 1999) (holding that a class of all high school female athletes could not be certified – even if the alleged conduct of the defendant school system was discriminatory – when some female athletes did not share the same goals or interests as the named female plaintiffs because those unnamed female athletes were satisfied with and/or benefitted from the alleged discriminatory treatment).

However, such conflicts must not be speculative, see, e.g., Cullen v. Whitman Medical Corp., 188 F.R.D. 226, 231 (E.D. Pa. 1999) (rejecting inadequacy argument based on conflict because the claimed "named plaintiffs' potential conflicts with different types of former and current students are speculative indeed"), and "[p]otential conflicts relating to relief issues which would arise only if the plaintiffs succeed on common claims of liability on behalf of the class will not bar a finding of adequacy," Hanrahan v. Britt, 174 F.R.D. 356, 364 (E.D. Pa. 1997) (rejecting claim of conflict between current and former distributors of defendant).  See also Bartelson v. Dean Witter & Co., 86 F.R.D. 657, 661 (D.C. Pa. 1980) ("[W]e do not believe that hypothetical conflicts, which have no basis whatsoever in the record, should influence our consideration of plaintiff's adequacy as representative.").

The Health Clubs' hypothesized conflict between current and former health club

members is exactly that: hypothetical.  As the Court has previously stated, if the initiation fees charged by the Health Clubs violate the HCA, then all persons who paid those fees have been injured.  If, in every putative class action, courts were to speculate as to whether each individual class member wished to pursue the lawsuit, and if such speculation sufficed to negate the adequacy of the named representatives, the class active device would rapidly become extinct.

Conflicts between class members based on their respective relationships to the defendant are relevant only when the class representatives' economic interests and objectives *substantially* conflict with those of absent class members.  In the cases cited above, courts found that a conflict precluded adequacy where the class members are employees and franchisees of the defendants, and students in the defendants' schools.  These types of relationships involve much closer ties between the parties than the relationship between businesses and consumers.  The closer ties render any conflict more significant.  Moreover, there is no evidence to support the premises underlying the Health Clubs' argument that (1) Plaintiffs' success in the present litigation would result in a deterioration of the clubs' services, and (2) even if (1) were true, that current members would prefer to forgo recovery of cash to prevent such a deterioration.

The Court concludes that any potential conflict between current and former health club members is not substantial and is overly speculative and, thus, will not preclude a finding of the Plaintiffs' adequacy to represent the class.

### b.     Conflict Between Short-Term and Long-Term Members

The Health Clubs assert that the "cost of establishing a membership" includes the *pro rata* cost of the land (whether rented or purchased); the construction cost of the building,

including all light, heating and air conditioning, electrical, plumbing and build-out necessary for a health club; the cost of facilities (lockers, showers, saunas, steam rooms, rest rooms, etc.); and the cost of equipment (weights, weight machines, treadmills, exercise bicycles, etc.).  It is the Health Clubs' position that each health club member must contribute equally to defraying these costs, regardless of whether a member uses the club for one month or a lifetime.

The Plaintiffs, however, assert that these costs cannot be included the Membership Fee charged for the first month because the Health Clubs' practice of "frontloading" the costs of membership violates the HCA's prohibition of excessive "initiation fees."

According to the Health Clubs, the logical consequence of the Plaintiffs' position is a conflict between short-term and long-term members because, in the absence of such "frontloading," the fixed costs of establishing and maintaining the health club are effectively shifted onto one group (those who maintain their privileges for a longer period of time), while allowing those who remain members for only one month to avoid paying their *pro rata* share of these costs.

As a preliminary matter, because both named plaintiffs are no longer members, the potential conflict between short- and long-term members does not implicate the adequacy of the named plaintiffs as class representatives.  In addition, the apparent goal of the present litigation is prevent the overcharging of *both* long- and short-term members.  Challenging the practice of "frontloading" membership costs does not necessarily result in a shift of those costs to long-term members.  Rather, it potentially could result in a shift of costs from up-front "membership fees" to monthly payments, in which case the amount each member pays would directly correlate with

the number of months the member used the gym.  While long-term members inevitably would

pay more than short-term members, they would not pay *disproportionately* or *irrationally* more.

Thus, this potential conflict between class members, which is speculative at best, is insufficient

to preclude class certification on the basis of adequacy.

### c.    Conflict Between Default and Non-Default Members

The Health Clubs also assert that there is a conflict between health club members who

defaulted on their contracts and members who did not.  According to the Health Clubs,

certification of the proposed Class will expose members who defaulted on their contracts to

counterclaims for the unpaid balances.  Thus, argue the Health Clubs, defaulted members'

interests will not be served by certification and the class representatives will have subjected

absent class members to counterclaims which otherwise might not have been brought.[14]  In this

way, the named plaintiffs' interests may not be aligned with those of the Class.

The Court acknowledges that under certain circumstances counterclaims against absent

class members can be problematic.  See Heaven v. Trust Co. Bank, 118 F.3d 735, 737-38 (11th

Cir. 1997) (debt counterclaims against absent class members raised conflict and rendered class

action unmanageable); Stewart v. Avon Prods., Inc. 1999 WL 1038338, at *4 (E.D. Pa. Nov. 15,

1999) (same); George v. Beneficial Finance Co., 81 F.R.D. 4, 7 (N.D. Tex. 1977) (court denied

certification noting that certification would result in counterclaims which not only might not have

been brought in federal forum, "but more importantly might never have been filed at all").

---

[14] The Health Clubs posit that most members of the "Class" who defaulted on their contract were never sued and, but for certification, would likely never be sued for default.  For example, Mr. Swindell defaulted on the balance due on his contract on September 20, 2004, but was not sued for that balance.

However, hypothetical counterclaims do not impact class certification, particularly where the record provides no basis for finding that such counterclaims would create difficulties that outbalance the advantages of class treatment. For example, in <u>Heaven</u>, the court pointed to the manageability problems caused by counterclaims *that had already been filed*. 118 F.3d 735 Likewise, other courts have noted that class certification would not be barred by "the mere possibility that the defendant would assert counterclaims" where "the district court could not have known the nature of such counterclaims because none had been filed." <u>Roper v. Consurve, Inc.</u>, 578 F.2d 1106 (5th Cir. 1978).[15]

In addition, the Court is not persuaded by the defensive "sabre-rattling" that such counterclaims, even if they in fact exist, cause a conflict between class members. In some ways, defaulted class members have an even greater interest in the lawsuit than non-defaulted members because they have more to gain. A person who is in default may well want to void his or her contract or, if appropriate, cure the default by off-setting any monetary damages. Moreover, Mr. Swindell is one of those purportedly in default on his contract (Tr. 1/9/08 at 44), and thus reasonably can be expected to protect the interests of similarly situated class members. In sum, at this time, it appears that all class members have an interest in ascertaining whether the fees they were charged violate the HCA, which is the central question in this suit.[16]

---

[15] The parties dispute whether counterclaims against absent class members are compulsory under Rule 13. The Court states no conclusion as to that issue at this time.

[16] Excluded from the Class are any putative Class members who have already adjudicated their rights under their contracts and received a final judgment or discharge in bankruptcy such that any claims raised in the present suit were actually decided or could have been asserted in the earlier action. Any such claims are barred by the doctrine of *res judicata.*

34

### d.    Adequacy of Mr. Swindell as a Class Representative

The Health Clubs contend that Mr. Swindell is not an adequate class representative because his unique factual circumstances raise a variety of specific defenses, including ratification, estoppel, voluntary payment and an offset for use of his membership privileges. According to the Health Clubs, Mr. Swindell used his membership privileges repeatedly and consistently over a 21-month period, and then purchased a second contract with full knowledge of the costs and benefits available under the contract.  Consequently, argue the Health Clubs, Mr. Swindell can no longer void either contract.

Defenses specific to a proposed class representative or a subset of class members can destroy both typicality and adequacy.  As the Court of Appeals for the Third Circuit explained,

> [c]ourts of appeals have held that unique defenses bear on both the typicality and adequacy of a class representative. See, e.g., Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 903 F.2d 176, 180 (2d Cir. 1990) ("Regardless of whether the issue is framed in terms of the typicality of the representative's claims . . . or the adequacy of its representation . . . there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it."); J.H. Cohn & Co. v. Am. Appraisal Assocs., 628 F.2d 994, 999 (7th Cir. 1980) ("[T]he presence of even an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality of the class as well as bring into question the adequacy of the named plaintiff's representative."). Commentators agree.

Beck, 457 F.3d at 296.  The danger is that the "representative's interests might not be aligned with those of the class, and the representative might devote time and effort to the defense at the expense of issues that are common and controlling for the class."  Id.

Here, however, the asserted defenses are largely irrelevant to the question of liability.

35

And even if the defenses do apply, Mr. Swindell's circumstances are typical of those of other class members because most, if not all, class members knew what they were buying and accepted the benefits under their contracts.  The fact that Mr. Swindell purchased two contracts is legally immaterial because that factual difference does not raise any defenses that are likely to become "a major focus of the litigation."  See Beck, 457 F.3d at 301 ("A proposed class representative is neither typical nor adequate if the representative is subject to a unique defense that is *likely to become a major focus of the litigation*.") (emphasis added).

    In addition, the Health Clubs contend that Mr. Swindell is not an adequate representative because he has no real knowledge of the case and has not participated in it thus far.  In particular, the Health Clubs point to Mr. Swindell's deposition testimony indicating that he did not know why his attorneys dismissed Bally Fitness as a defendant, or that the case was originally filed in state court and removed to federal court, or whether he reviewed any pleading (other than answers to interrogatories) before the pleading was filed.  Mr. Swindell likewise testified that he has never been to court for this case, does not know why there are four law firms representing him, does not know the status of discovery, does not know who the judge is or the next hearing date, does not know the Administrator's qualifications to be a class representative, has never spoken to Ms. Robinson, does not know what is required for class certification, does not intend to pay anything or assume any financial responsibility for the case, and does not know the qualifications of his attorneys.  (See Swindell Dep. 25-29, 126-45, Def. Ex. C.)  Moreover, argue the Health Clubs, because Mr. Swindell has joined another health club and has no intention of ever joining a Bally club again (Id. at 104-05, 139), Mr. Swindell has no personal interest in the

injunctive or declaratory relief sought in the Complaint.[17]

A class representative must have some minimal knowledge about the case and be able to make the requisite decisions required of a plaintiff.  See Kaplan v. Pomerantz, 131 F.R.D. 118, 121 (N.D. Ill. 1990) ("A plaintiff whose knowledge is so wanting that [he] appears to be no more than a pawn of attorneys who seek a large fee award may be an inadequate class representative."); Rand v. Monsanto Corp., 926 F.2d 596, 599 (7th Cir. 1991) ("Although a representative plaintiff need not immerse [herself] in the case, the named plaintiff must have *some* commitment to the case, so that the 'representative' in a class action is not a fictive concept."); Smyth v. Carter, 169 F.R.D. 28, 33 (W.D. Va. 1996) (A class representative "must be able, at a minimum, to make important nondelegable decisions about the course of the litigation . . . .").

In other words, "the class's attorney may not become the *de facto* plaintiff."  Kelley v. Mid-American Racing Stables, Inc., 139 F.R.D. 405, 409 (W.D. Okla. 1990).  For example, courts have denied certification where the representative appeared unaware of even the most material aspects of his case, not knowing why particular defendants are being sued, and having no conception of the class of persons that he purportedly represents.  See, e.g., Burkhalter Travel Agency v. MacFarms Int'l, Inc., 141 F.R.D. 144, 153-54 (N.D. Cal. 1991); see also Griffin v. GK

---

[17] The Health Clubs also assert that Mr. Swindell is not an adequate class representative against Bally Holding, Holiday or PFCP because his claim against Scandinavian does not depend upon the ability to pierce the corporate veil.  Consequently, his recovery will not be affected by whether the corporate veil against Bally Holding, Holiday or PFCP is pierced, a legal issue upon which recovery by many of the putative class members depends.  As previously discussed, the Plaintiffs maintain that they do not intend to pierce any corporate veil, and that if PFCP clubs are not owned by the Health Clubs, its members are not within the proposed class.

Intelligent Sys., Inc., 196 F.R.D. 298, 302 (S.D. Tex. 2000) (holding that representatives who did not participate in litigation decisions, did not receive expense information, and learned of the activity in the case only when copied on matters already completed were merely lending their name to class counsel and were not adequate representatives).

Nonetheless, the Supreme Court has held that a class representative's lack of knowledge about his case does not make him an inadequate representative. Surowitz v. Hilton Hotels Corp., 383 U.S. 363 (1968). In Surowitz, the answers the plaintiff gave when she was deposed indicated that she did not understand the complaint, could not explain statements contained in it, and knew little about either the lawsuit or the alleged misconduct on the part of the defendant. Id. at 366. The Court held that neither the plaintiff's ignorance about the case, nor her reliance on the advice of her son-in-law and her lawyer rendered her an inadequate representative. Id. at 371. See also Lewis v. Curtis, 671 F.2d 779, 789 (3d Cir. 1982) (a representative need not have "personally derived the information pleaded in the complaint or . . . be able to assist his counsel"); Mueller v. CBS, Inc., 200 F.R.D. 227, 238 (W.D. Pa. 2001) (the adequacy of putative class representatives does not depend on their legal knowledge, nor are they required to know all the facts about the class as a whole).

Here, Mr. Swindell appears to be sufficiently interested and engaged in the case to serve as an adequate class representative. Mr. Swindell reviewed and verified the original Complaint (Swindell Dep. 21), and participated in responses to interrogatories, document requests, and requests for admission (id. at 16-19, 150-51). He also is aware of the theory of the lawsuit (id. at 33, 38), and participated at his deposition, for which he had to travel from his home in Pittsburgh to Philadelphia.

The Court concludes that Mr. Swindell will fairly and adequately represent the interests of the Class despite his decidedly minimal knowledge of the case at this time and certain factual disparities.

### e.      Adequacy of the Administrator as a Class Representative

The Health Clubs assert that the Administrator of Ms. Robinson's estate also is not an adequate class representative because of Ms. Robinson's unique factual circumstances and the Administrator's lack of knowledge or participation in the case.

First, according to the Health Clubs, Ms. Robinson's unique factual circumstances preclude the Administrator of her estate from being an adequate representative.  Specifically, argue the Health Clubs, Ms. Robinson used her health club privileges for years, thereby eliminating any right she may have had to void her contract.  Like Mr. Swindell, she also signed up for a second contract with full knowledge of the costs and benefits of her first contract, and made voluntary payments under both contracts.  The Health Clubs contend that these factual circumstances raise unique defenses that may not apply to other class members.

Second, the Health Clubs assert that the Administrator "lacks any knowledge whatsoever of this lawsuit and has not participated at all, other than signing interrogatories and sitting for his deposition."  (Def. Response 35.)  At his deposition, the Administrator testified that he never read the document request directed to him; that he "went through" the Complaint, but "didn't read it"; that he has no knowledge of any of the claims made in the Complaint; that he does not have any knowledge of the facts or claims set forth in the Joinder Complaint; that he had no knowledge of the lawsuit before attorney David Searles contacted him; that he is not familiar

39

with the claims made by Ms. Robinson in the lawsuit and does not know what damages she

suffered; that he knows only that the case is about "overcharging" Ms. Robinson, but knows no

facts as to why she claimed to be overcharged; that he does not know what a class action

representative is; that he does not know what his duties and responsibilities in the lawsuit are;

that he does not know the definition of the class of persons he seeks to represent; that he does not

remember having any participation in preparing the "Plaintiff Administrator of the Estate of

Estelle Robinson's Objections and Answers to Defendants' First Set of Interrogatories," although

he signed those answers; that he never saw "Defendants' First Request for Production of

Documents"; that he does not know whether he has any financial responsibility for this lawsuit;

that he does not know any of the other attorneys representing him other than Mr. Searles; and that

he never saw Ms. Robinson's second contract.  (Administrator Dep. 22-29, 36-54.)

In addition, the Administrator testified that he has no knowledge of the facts regarding

Ms. Robinson's signing of the first health club contract and has no knowledge of her use of the

club; that he does not know how much it cost for her to join the health club or how much she had

to pay each month; that he does not know if Ms. Robinson ever tried to cancel her membership;

that he does not know if she ever stopped using the club before she died; and that he does not

know what payments she made under the contract.  (Administrator Dep. 30-35.)

The Health Clubs contend that the Administrator's lack of involvement in and knowledge

about the case precludes him from satisfying the adequacy requirement because he has not and

cannot make important decisions about the course of the litigation, or protect the Class from the

divergent interests of the attorneys seeking to represent the Class.  See Gorsey v. I.M. Simon &

Co., 1990 WL 113606, at *1 (D. Mass. Aug. 1, 1990) (executrix of an estate could not satisfy the

40

adequacy requirement because she presented no evidence that she had any knowledge of the facts surrounding her husband's purchase of the securities in question and of her financial obligations as class representative, nor is there any evidence that she has the capacity to make class decisions).

Moreover, the Health Clubs contend that the Estate's only interest is in the recovery of money, and a declaratory judgment that Ms. Robinson's contracts are voidable would be meaningless without a recovery of damages. Likewise, argue the Health Clubs, the Estate has no standing to seek injunctive relief. These factors also weigh against a finding that the Administrator will be an adequate representative of the Class. See, e.g., Kilgo v. Bownman Transportation, Inc., 87 F.R.D. 26, 28-29 (N.D. Ga. 1980) (representative of deceased plaintiff's estate was not an adequate class representative where although he had an interest in back pay, he did not have the same interest in declaratory and injunctive relief as other members of the proposed class); Mixon v. Gray Drug Stores, Inc., 81 F.R.D. 413, 414 (N.D. Ohio 1978) (where a significant part of the relief prayed for in the complaint was injunctive relief, the estate of a deceased plaintiff, which only had an interest in damages, could not represent a class).

Lastly, the Health Clubs contend that their ability to assert their affirmative defenses against Ms. Robinson's claims is undermined by the Administrator's lack of knowledge with respect to the relevant facts.

There is no *per se* rule that an estate administrator cannot be a class representative, and courts have found estate administrators to be adequate class representatives notwithstanding the possible evidentiary and discovery challenges this might cause. See, e.g., Shamberg v. Ahlstrom,

111 F.R.D. 689, 695 (D.N.J. 1986) (executors of deceased shareholder's estate satisfied adequacy requirement and were entitled to certification of shareholder class of plaintiffs); <u>Georgine v. Amchem Prods, Inc.</u>, 83 F.3d 610, 630-31 (3d Cir. 1996) (discussing adequacy of named plaintiffs as class representatives without mentioning fact that many of the named plaintiffs were executors of estates of those allegedly injured), <u>rev'd in part on other grounds</u>, <u>Amchem Prods., Inc. v. Windsor</u>, 521 U.S. 591 (1997).

In the present case, as previously discussed, individual factual differences are not relevant to whether the fee charged was excessive – such individual considerations are relevant only to the amount of damages each class member might recover.  In addition, the Plaintiffs have conceded that monetary damages are the primary relief sought here and, therefore, the Administrator's sole interest in the recovery of money is consistent with the primary purpose of the litigation and serves the interests of the Class.  The Administrator's knowledge of the case, however, is bearly minimal.  Nonetheless, he is aware of the theory of the lawsuit (Allen Dep. 14, 35-36, Pl. Reply Ex. C), and has reviewed several documents in the case, including Ms. Robinson's contract and answers to interrogatories (<u>id.</u> at 18-19, 59-61).  He has also demonstrated an understanding of his role as a substitute plaintiff and putative class representative.  (<u>Id.</u> at 37, 53.)  While surely not an ideal class representative, Mr. Allen is at least minimally qualified to fairly and adequately represent the interests of the class.

### 2.    Adequacy of Plaintiffs' Counsel

The Health Clubs also assert that Plaintiffs' attorneys are not adequate class counsel under Rule 23(g).  In particular, the Health Clubs point to Plaintiffs' counsel's failure to

recognize conflicts between current and former health club members and failure to address the

potential counterclaims to which defaulted Class members may be exposed in the event of

certification.  In addition, the Health Clubs cite the performance of Plaintiffs' counsel in the case

thus far as evidence that counsel's representation of the Class will be inadequate.  For example,

Plaintiff's counsel added Bally Total Fitness Corporation ("Bally Fitness") as a defendant on

September 30, 2005, but then on November 4, 2005, after the Health Clubs removed the case to

federal court, dismissed the claims against Bally Fitness in conjunction with an effort to remand

the case.  The Health Clubs suggest that the failure to pursue claims on November 4, 2005 that

were apparently asserted in good faith one month earlier on September 30, 2005 demonstrates

counsel's inadequacy.  The Health Clubs also point to Plaintiffs' counsel's failure to meet the

deadline for filing a class certification motion under the local rules of this District.

Not surprisingly, Plaintiffs' counsel vigorously defend their adequacy to represent the

class, citing their experience and past appointments as class counsel.  See, e.g., Perry v.

FleetBoston Fin. Corp., 229 F.R.D. 105, 112-13 (E.D. Pa. 2005) ("I and a number of my

colleagues have previously found that class counsel, . . . Donovan Searles, LLC, possess the skill,

experience and qualifications necessary to conduct litigation similar to the present lawsuit."); Pl.

Mot. Ex. B.

Given Plaintiffs' counsel's prior experience representing consumer classes in this District

and in others, the Court concludes that counsel is adequate and qualified to represent the Class.

In this Circuit, the named plaintiff's choice of counsel "should negatively impact our

determination of adequacy at this early stage only if the proposed lead counsel is 'so deficient as

to demonstrate that it will not fairly and adequately represent the interests of the class.'" In re

<u>Vicuron Pharmaceuticals, Inc. Sec. Litig.</u>, 225 F.R.D. 508, 511-512 (E.D. Pa. 2004) (<u>quoting</u> <u>In</u>

<u>re Cendant Corp. Litig.</u>, 264 F.3d 201, 266 (3d Cir. 2001)).  Here, there is nothing to indicate that

Plaintiffs' counsel is so deficient as to jeopardize the interests of the class.  <u>Cf.</u> <u>Davis v. Kraft</u>

<u>Foods N. Am.</u>, 2006 WL 237512, at *9 (E.D. Pa. Jan. 31, 2006) (finding class counsel

inadequate with respect to disparate discipline claim where in a separate suit plaintiffs' counsel

also represented the defendant's former employee relations manager who was involved in

disciplinary decisions).

## III.    Rule 23(b)

In addition to meeting the requirements of Rule 23(a), the Plaintiffs also must

demonstrate that at least one of the requirements set forth in Rule 23(b) is met.[18]  Here, the

---

[18] Rule 23(b) provides:

(b) Types of Class Actions. A class action may be maintained if Rule 23(a) is
satisfied and if:
(1) prosecuting separate actions by or against individual class members would create
a risk of:
    (A) inconsistent or varying adjudications with respect to individual class
members that would establish incompatible standards of conduct for the party
opposing the class; or
    (B) adjudications with respect to individual class members that, as a practical
matter, would be dispositive of the interests of the other members not parties to the
individual adjudications or would substantially impair or impede their ability to
protect their interests;
(2) the party opposing the class has acted or refused to act on grounds that apply
generally to the class, so that final injunctive relief or corresponding declaratory relief
is appropriate respecting the class as a whole; or
(3) the court finds that the questions of law or fact common to class members
predominate over any questions affecting only individual members, and that a class
action is superior to other available methods for fairly and efficiently adjudicating the
controversy. The matters pertinent to these findings include:
    (A) the class members' interests in individually controlling the prosecution
or defense of separate actions;

Plaintiffs assert that this action is appropriate for certification under all three subsections of Rule 23(b).  The Health Clubs object to certification under any subsection of Rule 23(b).

### A.      Certification Under Rule 23(b)(1) or (b)(2)

The Plaintiffs contend that the alleged uniform practice and policy conducted by the Health Clubs in violation of the HCA raises issues common to all class members.  Consequently, argue the Plaintiffs, the outcome of individual lawsuits could produce incompatible results and prejudice the rights of other putative class members, making certification under Rule 23(b)(1)(A) is appropriate.  Specifically, the Plaintiffs maintain that the crux of the case is what standard the Health Clubs must follow in charging consumers for the initiation of health club memberships, that is, whether the initiation charges must be reasonably related to the actual cost of setting up the new membership, or whether the Health Clubs may pro rate all expenses incurred in acquiring and running their clubs and include such expenses in the initial "Membership Fee."

The Plaintiffs also seek certification under Rule 23(b)(2) on the grounds that the Complaint seeks declaratory and injunctive relief, and the Health Clubs' alleged conduct is generally applicable to the Class.

The Health Clubs respond that certification under Rule 23(b)(1) or (b)(2) is improper

---

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b).

because certification under those subsections constitutes a mandatory class.  Bunnion v.

Consolidated Rail Corp., 1998 WL 372644, at *13 (E.D. Pa. May 14, 1998).  "That is, the class

members may not opt out of the action and 'pursue separate litigation that might prejudice other

class members or the defendant.'"  Id. at *13 (quoting 5 Moore's Federal Practice § 23.40[2] (3d

ed. 1998)).  According to the Health Clubs, the potential conflicts between various subsets of the

proposed Class render a mandatory class improper.  Moreover, argue the Health Clubs, to

properly proceed under Rule 23(b)(2), the Complaint must seek relief which is *predominantly*

injunctive or declaratory, and here the Plaintiffs are seeking primarily monetary relief.

Certification pursuant to Rule 23(b)(1)(A) generally is not appropriate in cases in which

the primary relief sought is monetary damages.  3D Moore's Federal Practice 23.41[6][a].

"Normally, the mere possibility that a defendant might be liable for payments to some potential

class members but not to others does not constitute the 'incompatible standards of conduct' of

concern in Rule 23(b)(1)(A)."  Vaughter v. Eastern Air Lines, Inc., 817 F.2d 685, 690 (11th Cir.

1987); see also Contawe v. Crescent Heights of America, Inc., 2004 WL 296631, at *4 (E.D. Pa.

Dec. 21, 2004) ("Rule 23(b)(1)(A), which seeks to prevent 'incompatible standards of conduct,'

is not meant to apply where the risk of inconsistent results in individual actions is merely the

possibility that the defendants will pay damages to some claimants but not to others . . . .").

However, "[a] class may be certified under Rule 23(b)(1)(A) if monetary damages are sought,

along with injunctive relief, but the monetary relief must not predominate."  Panetta v. SAP

America, Inc., 2006 WL 924996, at *2 (E.D. Pa. Apr. 6, 2006) (citing Bunnion, 1998 WL

372644, at *13).

Similarly, certification under Rule 23(b)(2) also is inappropriate where the primary relief

46

sought is not injunctive or declaratory relief.  Contawe, 2004 WL 2966931, at *4; 3D Moore's

Federal Practice 23.43[3][b].  As the Court of Appeals for the Third Circuit has explained,

> Subsection (b)(2) class actions are "limited to those class actions
> seeking primarily injunctive or corresponding declaratory relief."  1
> Newberg on Class Actions § 4.11, at 4-39. The (b)(2) class "serves
> most frequently as the vehicle for civil rights actions and other
> institutional reform cases that receive class action treatment."  Baby
> Neal v. Casey, 43 F.3d 48, 58-59 (3d Cir. 1994). Indeed, (b)(2) was
> "designed specifically for civil rights cases seeking broad declaratory
> or injunctive relief for a numerous and often unascertainable or
> amorphous class of persons." 1 Newberg on Class Actions § 4.11, at
> 4-39.

Barnes v. American Tobacco Co., 161 F.3d 127, 142 (3d Cir. 1998).  Certification under Rule

23(b)(2) is also inappropriate where many putative class members "have nothing to gain from an

injunction, and the declaratory relief they seek serves only to facilitate the award of damages."

Langbecker, 476 F.3d at 317; see also Miller v. Hygrade Food Prods. Corp., 198 F.R.D. 638, 641

(E.D. Pa. 2001) ("Where a class seeks monetary relief, the class becomes less cohesive because

assessing these damages often necessitates an examination into individual claims.").

    Here, where the Complaint seeks both injunctive and declaratory relief and damages, the

applicability of Rule 23(b)(1) and (b)(2) depends upon whether the primary relief sought is

money damages.  To determine whether a suit seeks predominantly equitable or monetary relief,

a court must examine the "realities of the litigation."  Yeager's Fuel, Inc. v. Pennsylvania Power

& Light Co., 162 F.R.D. 471, 480 (E.D. Pa. 1995).  "[M]onetary relief predominates in (b)(2)

class actions unless it is *incidental* to requested injunctive or declaratory relief."  Barabin v.

Aramark Corp., 210 F.R.D. 152, 160-161 (E.D. Pa. 2002) (quoting Allison v. Citgo Petroleum

Corp., 151 F.3d 402 (5th Cir. 1998)) (emphasis added).

47

"Incidental damages, in turn, are those 'that flow directly from liability to the class as a whole on the claims forming the basis of the injunctive or declaratory relief.'" Id. at 161 (quoting Allison, 151 F.3d at 415; Miller, 198 F.R.D. at 641).  In determining whether damages are "incidental" for purposes of this test, the Court should consider: "(1) whether such damages are of a kind to which class members would be automatically entitled; (2) whether such damages can be computed by 'objective standards,' and not standards reliant upon 'the intangible, subjective differences of each class member's circumstances'; and (3) whether such damages would require additional hearings.'" Id.

Here, assert the Health Clubs, the Plaintiffs' claims for monetary relief are not merely "incidental" to their claims for equitable relief because (1) putative class members would not automatically be entitled to damages, (2) any damages will depend upon each member's individual circumstances, and (3) additional hearings will be necessary to determine each person's alleged damages.  In addition, Plaintiffs concede in their Reply brief that "the primary relief sought in the litigation" is "the recovery of money."  (Pl. Reply 22; see also Pl. Reply 20 ("Here, Plaintiffs primarily seek money damages for the overcharging of membership fees by the Defendants.").)  Thus, argue the Health Clubs, monetary damages are the predominant form of relief sought.

The Court agrees.  Under the circumstances presented here, the Court cannot find that the primary relief sought is injunctive and/or declaratory in nature.  Rather, it is fair to say that the primary relief sought by the Plaintiffs is monetary in nature.  Here, there is no limited, statutory pool of damages to which class members are automatically entitled.  Cf. Fair Debt Collection Practices Act, 15 U.S.C. § 1692k(a)(2)(B) (expressly providing for class actions and capping

48

damages at the lesser of $500,000 or 1% of the net worth of the defendant);  Woodard v. Online

Information Servs., 191 F.R.D. 502, 507 (E.D.N.C. 2000) (holding that statutory damages under

the FDCPA are incidental to declaratory relief because the statutory damages are *de minimus* per

class member); Borcherding-Dittloff v. Transworld Sys., Inc., 185 F.R.D 558, 566 (W.D. Wis.

1999) (same); Young v. Meyer & Njus, 183 F.R.D. 231, 234-35 (N.D. Ill. 1998) (same);

Gammon v. GC Servs., 162 F.R.D. 313, 321-22 (N.D. Ill. 1995).

In addition, assuming liability is proved, any damages awarded to class members here

cannot be "computed by objective standards."   Rather, damages will depend upon the

particulars of each class member's membership program and circumstances, and additional

hearings on damages likely will be necessary.  Under the UTPCPL, in order to recover each class

member will have to demonstrate an ascertainable loss *as a result of* a prohibited action by the

Health Clubs.  Thus, the Court concludes that the primary relief sought is monetary damages and,

therefore, the Plaintiffs do not meet the criteria for class action certification under Rule

23(b)(1)(A) or (b)(2).[19]

**B.      Certification Under Rule 23(b)(3)**

Rule 23(b)(3) permits class actions where the Court finds that "the questions of law or

fact common to the members of the class predominate over any questions affecting only

individual members, and that a class action is superior to other available methods for the fair and

---

[19] In addition,"[w]hile 23(b)(2) class actions have no predominance or superiority
requirements, it is well established that the class claims must be cohesive."  Barnes, 161 F.3d at
143.  Because the Court finds that the primary relief sought here is monetary damages, thus
precluding certification under Rule 23(b)(2), the Court need not address the "cohesion"
requirement.

efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).

       1.      **Predominance**

The Plaintiffs contend that the alleged uniform practice of charging excessive initiation fees in violation of the HCA raises issues common to all class members.  Consequently, argue the Plaintiffs, because the alleged violation is the same for each class member, common questions of law and fact predominate.  See In re Prudential Ins. Co., 148 F.3d 283, 314-15 (3d Cir. 1998) (common issues predominate over individual issues where plaintiffs have alleged a common course of conduct on the part of a defendant).  In response, the Health Clubs again point to the individual issues raised by the different membership programs and the defenses of ratification, waiver, estoppel, laches and voluntary payment, which, they argue, predominate over any common issues.

"The Rule 23(b)(3) predominance inquiry tests whether the class is sufficiently cohesive to warrant adjudication by representation, and mandates that it is far more demanding than the Rule 23(a)(2) commonality requirement."  In re LifeUSA Holding Inc., 242 F.3d 136, 144 (3d Cir. 2001).  "[T]he presence of individual questions does not *per se* rule out a finding of predominance."  In re Prudential, 148 F.3d at 315.  In determining whether common problems predominate, the court's inquiry is directed primarily toward the issue of liability, as the necessity of calculating individual damages does not preclude class certification.  Barabin, 210 F.R.D. at 161-162; see also In re Community Bank, 418 F.3d 277, 305-06 (3d Cir. 2005) ("Although the calculation of individual damages is necessarily an individual inquiry, courts have consistently held that the necessity of this inquiry does not preclude class action treatment where class issues

predominate."); Chiang v. Veneman 385 F.3d 256, 273 (3d Cir. 2004) ("[I]t has been commonly recognized that the necessity for calculation of damages on an individual basis should not preclude class determination when the common issues which determine liability predominate.") (citations omitted).

Likewise, "[a]lthough the 'mere fact' of an affirmative defense 'does not compel a finding that individual issues predominate over common ones,' class certification is inappropriate if individual defenses will be widespread through the class and vary significantly among class members." Ritti v. U-Haul Int'l, Inc., 2006 WL 1117878, at *11 (E.D. Pa. Apr. 26, 2006); see also Sanneman v. Chrysler Corp., 191 F.R.D. 441, 444 (E.D. Pa. 2000) (defendants' affirmative defenses presented individual issues precluding class certification).

Here, both the individual factual differences between class members and the Health Clubs' affirmative defenses become relevant only at the damages phase of the litigation.  As previously discussed, the central issue of the liability phase is whether the Health Clubs charged members excessive initiation fees in violation of the HCA.  The legal and factual questions related to this central issue – i.e., what constitutes an "initiation fee" within the meaning of the HCA and whether the Health Clubs' membership fees were "reasonably related to the Club's cost of establishing the initial health club membership" – may be asked without variation of each membership program and are independent of whether or for long how members used their memberships or otherwise accepted and/or paid for the benefits under their contracts.  Because the individual differences between class members are relatively minor and primarily related to damages, the Court concludes that the proposed Class is "sufficiently cohesive to warrant adjudication by representation."  Thus, the predominance requirement is satisfied.

51

2.      **Superiority**

Under Rule 23(b)(3), the Court must also determine that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).  The Rule sets forth several factors relevant to the superiority inquiry: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3).  In effect, "[t]he superiority requirement asks the court to balance, in terms of fairness and efficiency, the merits of a class action against those of 'alternative available methods' of adjudication."   In re Prudential, 148 F.3d at 316 (citation omitted).

The Plaintiffs contend that because the Health Clubs "have violated the rights of a large number of geographically dispersed persons to such an extent that the cost of pursuing individual litigation to seek recovery against a well-financed adversary is not feasible," a class action is not only efficient, but also fair.  (Pl. Mem. 15.)  According to the Plaintiffs, the alternatives to a class action offer either no recourse for many injured consumers, or a multiplicity of scattered suits litigating essentially the same issue.  (Id.)  Thus, argue the Plaintiffs, a class action is superior to other available alternatives.

The Health Clubs respond that Rule 23(b)(3)'s superiority requirement is not met here because the impracticality of separate suits "by itself is insufficient to overcome the hurdles of predominance and superiority and efficient and fair management of a trial, which Rule 23(b)

requires." In re Life USA, 242 F.3d at 148 n.13.  Here, argue the Health Clubs, because

resolution of both liability and damages will require an individualized inquiry into each class

member's agreement, payment and club usage, manageability problems outweigh the underlying

policy of saving time and resources.

As previously discussed at length, contrary to the Health Clubs' assertions, the Court

determines that individualized inquiries will not be relevant with respect to the central question

of liability.  Despite the potential necessity of individualized inquiries as to damages, the Court

concludes that a class action is preferable to numerous individual suits litigating virtually

identical issues.  Moreover, the class action device is particularly appropriate where, as here,

individual class members would be financially unable or unwilling to bring individual suits.

Under the circumstances presented here, the class action device "saves the resources of both the

courts and the parties by permitting an issue potentially affecting every [class member] to be

litigated in an economical fashion under Rule 23."  General Tel. Co. v. Falcon, 457 U.S. 147,

155 (1982) (quoting Califano v. Yamasaki, 442 U.S. 682, 701 (1979)).

Moreover, when evaluating a motion for class certification, the Third Circuit Court of

Appeals has advised courts to resolve doubts in favor of approving certification.  Eisenberg v.

Gagnon, 766 F.2d 770, 785 (3d Cir. 1985); see also Williams v. Empire Funding Corp., 227

F.R.D. 362, 372 (E.D. Pa. 2005) ("When doubt exists concerning certification of the class, the

court should err in favor of allowing the case to proceed as a class action.") (citation omitted).

With respect to the Plaintiffs' UTPCPL claim in particular, the Health Clubs also assert

that class treatment is inappropriate because of the UTPCPL's ascertainable loss requirement.

The UTPCPL provides for a private right of action for any person who "suffers any ascertainable loss of money of property, real or personal *as a result of* the use or employment by any person of a method, act or practice declared unlawful by section 3 of this act . . . ." 73 PA. CONS. STAT. ANN. § 201-9.2 (emphasis added).[20]  Thus, a class member cannot maintain an action under the UTPCPL unless he or she can establish an ascertainable loss as a result of the alleged violation. Weinberg v. Sun Co., Inc., 777 A.2d 442, 442 (Pa. 2001).  Simply alleging a violation of a consumer protection statute "does not automatically entitle an individual to bring a private action under the UTPCPL." Williams, 227 F.R.D. at 370.

Under certain circumstances, this causation requirement may preclude class treatment of

---

[20] Section 201-9.2 provides in relevant part:

> (a) Any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of this act, may bring a private action to recover actual damages or one hundred dollars ($100), whichever is greater. The court may, in its discretion, award up to three times the actual damages sustained, but not less than one hundred dollars ($100), and may provide such additional relief as it deems necessary or proper. The court may award to the plaintiff, in addition to other relief provided in this section, costs and reasonable attorney fees.

73 P.S. § 201-9.2.  The HCA specifically provides that a violation of the HCA also constitutes a violation of the UTPCPL:

> A violation of this act shall constitute a violation of the act of December 17, 1968 (P.L. 1224, No. 387), known as the Unfair Trade Practices and Consumer Protection Law, and shall be subject to the enforcement provisions and private rights of action contained in that act.

73 P.S. § 2175(a).

54

some claims.  For example, in Weinberg, gasoline consumers brought an action against an oil company alleging deceptive advertising concerning the benefits of using higher octane gasoline and asserting claims under the UTPCPL.  777 A.2d at 443-44.  The Pennsylvania Supreme Court held that the "ascertainable loss" language "clearly requires, in a private action, that a plaintiff suffer an ascertainable loss *as a result of* the defendant's prohibited action."  Id. at 446 (emphasis in original).  In that case, where the alleged statutory violation was false advertising, the "ascertainable loss" requirement translated into "numerous and extensive" questions of fact "applicable to each individual private plaintiff," rendering a class action unmanageable.  Id.

Similarly, in Williams, the court declined to certify a class of homeowners seeking relief for alleged debt-collection practices under the UTPCPL due to the plaintiff's failure to demonstrate an ascertainable loss as a result of the alleged violation.  227 F.R.D. at 370.  Specifically, even though the plaintiff contended that she suffered an ascertainable loss of money as a result of the defendant's improper telephone calls, the plaintiff failed "to show whether she or *any* proposed class member suffered an ascertainable loss of money or property as a result of defendant's debt-collection form letters."  Id.  Because the plaintiff did not claim the defendant's mailing of form letters caused her injury, but rather asserted that it was the *telephone calls*, which were not the alleged unlawful conduct common to all class members, that caused her to suffer a monetary loss, the court determined that the UPTCPL's causation requirement had not been satisfied.  The court held that "[w]ithout a showing of an ascertainable loss of money or property to plaintiff and the class members resulting from defendant's alleged mailings, plaintiff cannot

meet all the requirements for class certification."  Id. at 371.[21]

In contrast, in Cohen v. Chicago Title Insurance co., – F.R.D. – , 2007 WL 1067034 (E.D. Pa. Apr. 5, 2007), the plaintiff sought to certify a class of all those mortgagors in Pennsylvania who refinanced and bought a lender's policy from the defendant title insurer and paid more than the defendant's filed rate structure provided.  The court certified a class based on unjust enrichment and UTPCPL claims.  As the Health Clubs acknowledge, in that case, there was no real issue as to "ascertainable loss" because the entire class allegedly was charged in excess of the filed rate.  (See Def. Sur-Response 3 n.4.)

The factual circumstances presented here are closely analogous to those in Cohen, and significantly different from those in Weinberg, Williams and Piper I.  Here, the Plaintiffs allege that the Health Clubs charged excessive initiation fees in violation of the HCA and the UTPCPL.  The HCA prohibits initiation fees in excess of the reasonable cost of establishing a membership.  73 P.S. § 2165.  Based on the assumption that any such costs should not exceed $100, the Plaintiffs seek to certify a class of all health club members who paid an initiation fee in excess of $100.  Thus, as in Cohen, all class members allegedly were charged excessive fees and, therefore,

--------

[21] In Piper v. Portnoff Law Associates, 215 F.R.D. 495 (E.D. Pa. 2003) ("Piper I"), another case cited by the parties, the court initially certified the class on the basis of the federal claims, but expressly denied certification of the UTPCPL claims because the plaintiff was "unable to show that any members of the proposed class, aside from the named plaintiff, suffered an ascertainable loss as required under the [UTPCPL]."  Id. at 501.  While acknowledging that "questions of fact as to the exact amount of individual damages may not foreclose a class action," the court found it "impossible to ascertain how many of the defendants' letters included assessments for attorney's fees."  Id.  However, upon a showing that 148 class members had suffered an "ascertainable loss," the court subsequently certified the class with respect to the UTPCPL claims.  Piper v. Portnoff Law Associates, 216 F.R.D. 325, 329 (E.D. Pa. 2003) ("Piper II").

suffered an ascertainable loss.  The alleged monetary loss is a direct result of the Health Clubs'

alleged violation of the HCA, and the specific cause of the alleged loss – excess initiation fees –

is the same for each and every class member.

> As opposed to the factual questions at issue in <u>Piper I</u> and <u>Williams</u>, where it was unclear

which, if any, class members were exposed to the alleged misconduct, here the proposed Class

includes *only* those persons who purchased health club memberships and who paid in excess of

the alleged "reasonable" amount.  By definition, the proposed class excludes persons who did not

pay an allegedly excessive initiation fee and thus did not suffer an ascertainable loss.  Likewise,

there is no question here as to whether, if proven, the alleged misconduct resulted in a monetary

loss for each person who purchased a health club membership.  Unlike unfair debt collection

practices that may unlawfully harass the debtor without causing any monetary damage, an

excessive initiation fee that is paid by a consumer necessarily causes an ascertainable monetary

loss.

> Moreover, where the alleged violation is a uniform policy and practice of charging

excessive fees, there is no doubt as to the *cause* of the ascertainable monetary loss.  The fact that

individual class members may have paid differing amounts in excess of $100 is irrelevant.  <u>See</u>

<u>Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.</u>, 259 F.3d 154, 1880 (3d Cir. 2001)

("Proof of injury (whether or not an injury occurred at all) must be distinguished from calculation

of damages (which determines the actual value of the injury).").  Thus, the Court concludes that

the Plaintiffs have adequately demonstrated that most, if not all, class members have suffered an

ascertainable loss as a result of the Health Clubs' alleged practice of charging excessive initiation

fees.  This causation requirement does not preclude class certification under the circumstances

presented here.

However, the same does not hold true with respect to the unjust enrichment claims,[22] which the Court concludes cannot be tried on a class basis because the application of equitable relief "depends on the unique factual circumstances of each case." Styler v. Hugo, 619 A.2d 347, 350 (Pa. Super. 1993). Specifically, the elements of unjust enrichment include the benefits conferred on a defendant by the plaintiff, appreciation of such benefits by the defendant, and acceptance and retention of such benefits under such circumstances that it would be inequitable for the defendant to retain the benefit without payment of value. Id. Here, whether the Health Clubs have been "unjustly enriched" by any Class member will depend upon each Class member's contract terms, payments, length of membership, and usage of membership privileges. Thus, the question of liability as to the unjust enrichment claims is notably and significantly more complex and individualized than the question of liability under the HCA and the UTPCPL. Therefore, class certification is inappropriate as to the unjust enrichment claims.

**CONCLUSION**

Overall, the central issue in this case is the same for each and every member of the proposed Class, and the class action device appears to be the most efficient and fair way to resolve class members' claims. Thus, having determined that the requirements of Rule 23(a) and (b)(3) have been met, the Court concludes that the Motion for Class Certification will be granted as to Count I, Plaintiffs' claim for injunctive relief and damages pursuant to the UTPCPL, and

---

[22] According to Plaintiffs, Count II was pleaded as an alternative to Count I's claim for statutory violations "in the event that the class members' contracts were found to have been already voided by Defendants' illegal conduct." (Pl. Reply 5 n.5.)

Count III, Plaintiffs' claim for declaratory judgment.  The Motion is specifically denied, however, with respect to Count II, Plaintiffs' claims for unjust enrichment, accounting, disgorgement and restitution, because of the individual nature of those claims with respect to both damages and liability.  At this time, the Court also concludes that class action treatment of the Defendants' various defenses, including ratification, voluntary payment and waiver, is appropriate, even though these defenses may necessitate individualized inquiries and/or hearings at the damages phase of the litigation.  Class treatment of the defenses of laches and estoppel is appropriate in both the litigation and damages phases of the litigation.

An Order consistent with this Memorandum and outlining the specific issues of law and fact common to the class and appropriate for class treatment follows.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ANTHONY ALLEN AND** | : | **CIVIL ACTION** |
| **GENE SWINDELL,** | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **HOLIDAY UNIVERSAL, ET AL.,** | : | |
| **Defendants** | : | **NO. 05-5726** |

## ORDER

AND NOW, this 17th day of March, 2008, upon consideration of the Plaintiffs' Motion for Class Certification (Docket No. 46), the Defendants' response thereto (Docket No. 58), the Plaintiffs' reply (Docket No. 63), the Defendants' sur-response (Docket No. 69) and the Plaintiffs' sur-reply (Docket No. 70), it is hereby ORDERED that the Motion is GRANTED consistent with the accompanying Memorandum and as outlined in this Order.

IT IS FURTHER ORDERED that this action shall be maintained as a class action in accordance with Rule 23(b)(3) of the Federal Rules of Civil Procedure pursuant to the following findings:

1.      The Class is defined as "all persons who, on or after December 7, 1998, entered

into a contract for health club services with health clubs located in Pennsylvania

and owned by Defendants that required the payment of a membership fee in

excess of $100.00."[23]

2.      The Class, as defined is paragraph 1 of this Order, is so numerous that joinder of

        all members is impractical.

3.      There are questions of law and fact common to the Class, namely:

        a.      Whether Defendants have charged members of the Class for amounts not

                reasonably related to the Defendants' costs in establishing the initial health

                club membership in violation of Section 2165 of the Health Clubs Act

                ("HCA"), 73 PA. CONS. STAT. ANN. §§ 2161, *et seq.*;

        b.      Whether Plaintiffs are entitled to injunctive relief under the Pennsylvania

                Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73

                PA. CONS. STAT. ANN. §§ 201-1, *et seq.*, in the form of a permanent

                injunction against Defendants from violating the UTPCPL and the HCA in

                the future;

        c.      Whether Plaintiffs are entitled to monetary damages under the UTPCPL;

        d.      Whether Plaintiffs are entitled to a declaratory judgment that each Class

                member's contract with Defendants is voidable at the option of each

                respective Class member pursuant to Section 2167 of the HCA;

        e.      Whether Plaintiffs' claimed are barred by the doctrines of laches and/or

---

[23] Within 30 days of the date of this Order, the parties shall conclusively determine and
jointly report to the Court whether Physical Fitness Centers of Philadelphia is "owned" by the
Defendants within the meaning of the Class definition in paragraph 1 above.

estoppel;

  f.  If liability is proven, whether continued usage of the club and/or continued payment under contract waives any respective class member's right to void the contract; and

  g.  If liability is proven, whether continued usage of the club and/or continued payment under contract off-sets any respective class member's right to collect any monetary damages.

4.  The claims of Plaintiffs Anthony P. Allen, as the Administrator of the Estate of Estelle Robinson, and Gene M. Swindell are typical of the claims of the Class.

5.  Plaintiffs will fairly and adequately protect the interests of the Class.

6.  The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members.

7.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

8.  Plaintiff has presented a trial plan that describes the issues likely to be presented at trial and demonstrates that those issues are susceptible of class-wide proof.

ACCORDINGLY, IT IS HEREBY FURTHER

ORDERED that the Class as defined in paragraph 1 of this Order is hereby CERTIFIED; and it is further

ORDERED that Plaintiffs Anthony P. Allen, as the Administrator of the Estate of Estelle

3

Robinson, and Gene M. Swindell are certified as Class Representatives; and it is further

ORDERED that excluded from the Class are all officers and directors of the Defendants; and it is further

ORDERED that excluded from the Class are any putative Class members who have already adjudicated their rights under their contracts and received a final judgment or discharge in bankruptcy such that any claims raised in the present suit were actually decided or could have been asserted in the earlier action; and it is further

ORDERED that David A. Searles, Esq. of the firm of Donovan Searles, LLC; Joseph K. Goldberg, Esq.; John Blim, Esq. of the firm of Blim & Edelson, LCC; and David S. Blinn, Esq. of the Consumer Law Group, LLC shall serve as Class Counsel; and it is further

ORDERED that Plaintiffs shall submit a *detailed* revised trial plan consistent with this Order and Rule 23(c)(1)(B) within 30 days of the date of this Order; and it is further

ORDERED that Plaintiffs shall submit a proposed form of notice to the Class within 30 days of the date of this Order.


BY THE COURT:



<u>S/Gene E.K. Pratter</u>
GENE E.K. PRATTER
United States District Judge